Gary M. BELCH, Plaintiff,

v.

**JEFFERSON COUNTY; and James Lafferty, in his individual and official capacity, Defendants.**

No. 98–CV–1227.

United States District Court, N.D. New York.

Aug. 24, 2000.

Hite & Casey, P.C., Albany, NY, Meredith Savitt, of counsel, for Plaintiff.

Roemer, Wallace, & Minneaux, LLP, Albany, NY, John Minneaux, of counsel, for Defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

### I. Background

On July 30, 1998, Plaintiff Gary Belch commenced this action pursuant to 42 U.S.C. § 1983, alleging that Defendants disciplined him in violation of his First Amendment rights to freedom of speech and freedom of association and retaliated against him for exercising his First Amendment rights. Plaintiff also alleges that certain sections of the Jefferson County Sheriff's Department Unified Code of Conduct (the "Code of Conduct" or the "Code") are unconstitutional.

At all times relevant herein, Plaintiff, Gary Belch, was a Deputy Sheriff employed by the Jefferson County Sheriff's Department ("Sheriff's Department" or the "Department"). Plaintiff also served as the elected president of the Jefferson County Deputy Sheriff's Benevolent Association, Local 9100 (the "Sheriff's Association" or the "Union").

On September 5, 1997, Plaintiff investigated a motor vehicle accident by speaking with the driver at his place of employment, Channel 7, WWNY–TV. Earlier that same day, the Sheriff's Association had faxed press releases to the media endorsing candidates for election to the County legislature. When Channel 7 personnel recognized Plaintiff, they requested an interview with him concerning the Sheriff's Association's endorsements. At the con-

clusion of his investigation, Plaintiff agreed to give an on-camera interview with a television reporter.

During the interview, Plaintiff's statements were limited to his endorsement of political candidates running for election to the County legislature. Plaintiff was in uniform and on duty at the time of the interview. A review of a video tape of the interview indicates that a banner reading "Sheriff's Association" ran across the bottom portion television screen for approximately half of the interview. The interviewer's introduction included references both to the "Sheriff's Association" and "deputies" in general. The lead in stated "[t]he Jefferson County Deputy Sheriff's Association has thrown its support behind eleven incumbent legislators... In District 8... Deputies endorsed... [candidates names]." Lafferty Aff., Ex. A. The anchor's conclusion stated "The Association also failed to give support to two other incumbent legislators...." *Id.*

Shortly after the interview aired, two candidates who had not been endorsed by the Union complained to Sheriff Lafferty about the interview. As a result of these complaints, Sheriff Lafferty commenced an investigation. Undersheriff Simser conducted the investigation and determined that Plaintiff had given a television interview while in uniform and on duty without prior authorization. *See* Belch Aff. Ex. J. The Undersheriff concluded that this was a clear violation of the Code.[1]

On October 2, 1998, about one month after the complaints regarding the interview surfaced, Sheriff Lafferty issued a formal Notice of Discipline charging Plain-

tiff with: (1) making an unauthorized public statement and appearance, in violation of section 4.13 of the Code; (2) improper expenditure of departmental funds, in violation of section 4.16 of the Code; and (3) unexcused absence from post, which is not listed in the Code.

On October 16, 1997, Sheriff Lafferty met with, among others, Plaintiff and his Union representative to discuss the charges. At this meeting, Sheriff Lafferty told Plaintiff that the charges were based on his unauthorized television appearance and that he did not want him to appear on television again in his uniform. However, Sheriff Lafferty also told Plaintiff that as Union President he "could make whatever statement he chose to as long as he did not wear the uniform of the Sheriff's Department or represent himself to be a direct representative of the Sheriff in regards to political statements."[2] Belch Aff. Ex. K. Sheriff Lafferty further informed Plaintiff that he intended to put a letter of reprimand in his personnel file as a penalty for violating the Code. *See* Belch Aff. Ex. K; Ex. L. Plaintiff found this penalty unacceptable and elected to take the matter through the grievance and arbitration procedure set forth in the Collective Bargaining Agreement (the "CBA"). *See* Lafferty Aff. Ex. E.

On February 6, 1998, the matter was submitted to arbitration. In a decision dated March 6, 1998, the arbitrator found plaintiff guilty of all charges. With respect to the violation of Section 4.13, the Arbitrator found:

The Grievant and his Union argue that even though the Grievant participated in

---

1. Undersheriff Simser's report states, *inter alia*, "[t]he primary violation of [the] Code of Conduct is Article 4.13 which addresses public statements and appearances. The sum and substance of the article notes that no member is to address the public through radio or television on any subject or service while holding themselves out in an official capacity without the approval of the Sheriff. Certainly any one wearing an official Sheriff uniform commenting on a political election

would be holding themselves out as a representative of this agency." Belch Aff. Ex. J.

2. The memorandum memorializing the meeting continues: "The issue was number one that he made the statement while wearing [the uniform] and representing the Sheriff's Department while on the time that he should have been working on the road and unexcused absence from his post." Belch Aff. Ex. K.

the interview in uniform, he (and the interviewer) made it clear that he was acting in his capacity as Union President, and not as Deputy Sheriff. He argues that the banner across the bottom of the television screen indicated that he was President of the Local Union. However, that banner plus the interviewer's statement are not sufficient to overcome the impression that the uniform gives the viewer. Whenever a police officer wears a uniform, that police officer represents the agency. People identify the uniform and not the person. The Grievant may have been acting in the capacity of Union President, but in the eyes of the viewers, the Grievant was a uniformed representative of the Jefferson County Sheriff's Department. In the instant case, the Grievant participated in a television interview while he was wearing a Deputy Sheriff's uniform. The only conclusion that many people would make is that he was representing the Jefferson County Sheriff's Department.[3]

Lafferty Aff., Ex. F. The Arbitrator recommended that a letter of reprimand be placed in Plaintiff's personnel file which could be expunged in two years absent any acts of misconduct by Plaintiff.

On April 6, 1998, Sheriff Lafferty rejected the arbitrator's recommendation and issued a formal discipline to Plaintiff that included a one day's suspension and loss of two vacation days. Sheriff Lafferty stated that he "imposed a greater penalty upon [P]laintiff because of his belligerent attitude and his refusal to accept responsibility for his actions even after the arbitrator found him guilty of all charges." Lafferty Aff. ¶ 26. Sheriff Lafferty further stated "I also sincerely wanted to impress upon Plaintiff the importance of adhering to the chain of command." *Id.*

In April 1998, Plaintiff applied for a position as a Juvenile Aid Officer. Sheriff Lafferty did not select him for this position although Plaintiff was the most senior of all applicants. In October 1998, Plaintiff applied for the position of Detective–Drug Task Force. Sheriff Lafferty again selected someone else for the job.

On April 23, 1998, this Court heard oral argument on Defendants' motion to dismiss the Complaint pursuant to FED. R. CIV. P. 12(c) and Plaintiff's motion to strike Defendants' affirmative defense under the Hatch Act, 5 U.S.C. § 1501, *et seq.* The Court dismissed the Complaint against Sheriff Lafferty in his official capacity and the claim for punitive damages and granted Plaintiff's cross-motion to strike Defendants' affirmative defense. *See Belch v. Jefferson County and James Lafferty,* 98–CV–1227, April 23, 1999 [hereinafter Bench Decision].

## II. Discussion

Presently before the Court are two motions for summary judgment pursuant to FED. R. CIV. P. 56. Defendants seek to dismiss the Complaint in its entirety whereas Plaintiff seeks judgment as a matter of law on the issue of liability. The standard for summary judgment is well-settled and need not be restated here. This Court has set forth the appropriate standard to be applied in numerous published decisions, *see, e.g., Hoffman v. County of Delaware,* 41 F.Supp.2d 195 (N.D.N.Y.1999), *aff'd,* 205 F.3d 1323 (2d Cir.2000), and will apply the same standard discussed in these cases to the present motions for summary judgment.

### A. Is Section 4.13 of the Code unconstitutionally overbroad?

Defendants first move for summary judgment on Plaintiff's claim that Section

---

**3.** The decision of the arbitrator is not entitled to collateral estoppel. *See McDonald v. West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (finding that in a case brought pursuant to § 1983 "neither the full-

faith-and-credit provision of 28 U.S.C. § 1738, nor a judicially fashioned rule of preclusion, permits a federal court to accord res judicata or collateral-estoppel effect to an unappealed arbitration award.")

4.13 of the Code is overbroad. Plaintiff argues that the Code impermissibly restricts a broad category of speech and, thus, infringes on employees' First Amendment rights. Section 4.13 reads, in pertinent part: "[m]embers and employees of the department shall not ... appear on radio or television ... while holding themselves out as having an official capacity in such matter, without the approval of the Sheriff." Belch Aff., Ex. I.

"The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Chicago v. Morales*, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). A "facial challenge will not succeed unless the statute is 'substantially' overbroad," *National Endowment for the Arts v. Finley*, 524 U.S. 569, 619, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quoting *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)), which means that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *Id.* (quoting *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). Therefore, when possible, courts should read provisions to be constitutionally valid, *see Ferber*, 458 U.S. at 769, 102 S.Ct. 3348, and Plaintiff "must establish that no set of circumstances exists under which the [regulation] would be valid." *Shabazz v. Cuomo*, 1998 WL 102050, at *3 (S.D.N.Y. Mar.5, 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

In the context of First Amendment challenges, to survive constitutional scrutiny, a regulation must be narrowly tailored to serve a significant government interest.[4] *See Hill v. Colorado*, —— U.S. ——, 120 S.Ct. 2480, 2482, 147 L.Ed.2d 597 (2000); *Ward*, 491 U.S. at 791, 109 S.Ct. 2746; *Broadrick*, 413 U.S. at 611–12, 93 S.Ct. 2908. Moreover, "overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner." *Broadrick*, 413 U.S. at 614, 93 S.Ct. 2908 (collecting cases). Thus, where conduct and not merely speech is regulated, the overbreadth must be substantial before the statute involved will be invalidated. *See id.* at 615, 93 S.Ct. 2908; *Carlin Communications, Inc. v. F.C.C.*, 837 F.2d 546, 557 (2d Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 305, 102 L.Ed.2d 324 (1988). In order to determine whether the policy at issue here prohibits a substantial amount of protected speech and conduct such that it is unconstitutional, the court must weigh the interests of the City in restricting certain political activity with that of the plaintiff in engaging in such activity. *See United States Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

It is well-settled that the government has a recognized interest in the effective and efficient fulfillment of its responsibilities to the public. *See Connick v. Myers*, 461 U.S. 138, 142, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Moreover, courts have recognized the significant interest police departments have in maintaining "discipline, espirit de corps, and uniformity" with respect to effectively protecting the public. *See Kelley v. Johnson,*

---

4. The Court recognizes the need for the government, in certain instances, to regulate the time, place, and manner of expressive or communicative conduct. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct.

2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (collecting cases).

425 U.S. 238, 246, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *Heil v. Santoro*, 1997 WL 102451, at *7 (S.D.N.Y. Feb.28, 1997), *aff'd*, 147 F.3d 103 (2d Cir.1998); *Gordon v. Town of Hunter*, 1996 WL 77391, at *13 (N.D.N.Y. Feb.16, 1996) ("[A] police department has a more significant interest than the typical government employer in regulating the speech activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence.") (citing *Tyler v. City of Mountain Home, Arkansas*, 72 F.3d 568, 570 (8th Cir.1995)). Sheriff's Departments also have a recognized interest in avoiding the appearance of partisanship or partiality. *See, e.g., Letter Carriers*, 413 U.S. at 565, 93 S.Ct. 2880 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent."); *Jantzen v. Hawkins*, 188 F.3d 1247, 1258 (10th Cir.1999) ("In some cases, public endorsement of candidates by police officers has stirred great controversy within police departments and has distracted from 'the efficiency and the quality of the services' provided.") (citations omitted); *Thomas v. Whalen*, 51 F.3d 1285, 1291 (6th Cir.), *cert. denied*, 516 U.S. 989, 116 S.Ct. 518, 133 L.Ed.2d 426 (1995) (finding qualified immunity in case where police officer advocated for the National Rifle Association in uniform after noting that the police department had an interest in "preserving the appearance of neutrality in areas closely related to its core mission"); *Detroit Fire Fighters Ass'n, Local 334 v. City of Detroit*, 508 F.Supp. 172 (E.D.Mich.1981) (finding that political neutrality on the part of a paramilitary organization such as the fire department outweighs the right of individual firefighters to appear in uniform in television advertisements advocating a position on a political issue).

In the instant case, Defendants contend that Section 4.13 of the Code serves to maintain order and discipline among its officers and ensures that the Department remains unbiased and impartial to bolster public confidence in the fact that it administers the law in a fair and impartial manner. *See* Defs.' Mem. of Law at 2–3. Defendants further highlight the fact that the state has a strong interest in controlling official speech. *See id.* As noted above, allowing police officers to speak publicly on partisan political matters while appearing to have the official support of the department leads to both internal unrest and public relations problems. *See, e.g., Letter Carriers*, 413 U.S. at 564, 93 S.Ct. 2880 (recognizing "the obviously important [government] interests sought to be served by the limitations on partisan political activities ... contained in the Hatch Act."); *Sector Enterprises, Inc. v. DiPaleramo*, 779 F.Supp. 236, 244 (N.D.N.Y.1991). Citizens rightfully expect police agencies to enforce the law in a fair and just manner and their confidence in the police's ability to carry out this charge rests on the image of an impartial police force. A tainted public image of the police force, due to perceived partisanship, affects the force's ability to effectively serve the public. Accordingly, the Court recognizes that Jefferson County has a significant interest in regulating "official" statements made on behalf of the Department, particularly with respect to partisan political activities. Having found a legitimate state interest, the Court will now examine Section 4.13 to determine whether its construction is sufficiently narrow.

As previously noted, Section 4.13 provides, in part, that "[m]embers and employees of the department shall not ... appear on radio or television ... while holding themselves out as having an official capacity in such matter, without the approval of the Sheriff." Belch Aff., Ex. I. The regulation, as it stands, attempts to prohibit the place and manner in which statements are made by officers rather than the content of statements. Significantly, Section 4.13 does not restrict all

public statements/appearances made by officers, rather it only proscribes those statements/appearances made by officers "while holding themselves out as having an official capacity". *See Micilcavage v. Connelie,* 570 F.Supp. 975, 981 (N.D.N.Y. 1973) (finding that the regulation in question was unconstitutionally broad where it proscribed *all* speech, not only that dealing with official business or functions, and thus, attempted to restrict speech based solely on its content); *Ruff v. City of Leavenworth,* 858 F.Supp. 1546, 1557 (D.Kan. 1994) (finding that the city's policies swept too broadly where the policies prohibited *any and all* "political" activity/statements *irrespective* of the time, place, and manner in which the activity/statements occurred) (emphasis added).

█ Section 4.13 only proscribes officers from making public statements in a manner that makes it appear as though the statements have the official backing of the Sheriff's Department. In doing so, it leaves the officers of Jefferson County alternative means of public expression, for officers remain free to make public statements/appearances or engage in political activity as a private citizen or as a member of a political organization, civic association, or other group. *See Bery v. City of New York, et al.,* 1999 WL 812293, at *19 (2d Cir. Oct.10, 1999) ("A content-neutral regulation may restrict the time, place, and manner of protected speech, provided it . . . 'leave[s] open ample alternative channels for communication.' ") (citing *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Clark,* 468 U.S. at 293, 104 S.Ct. 3065)); *Zook v. Brown,* 748 F.2d 1161, 1167 (7th Cir.1984) ("[W]e do not believe that Standard 4.4, prohibiting officers from making public statements when acting as depart-

mental representatives, is directed at expressions of opinions by officers in their capacities as private citizens, and therefore we must reject [Plaintiff's] claim that it is impermissibly overbroad.").[5] Accordingly, the Court finds that Section 4.13's infringement upon First Amendment rights is not substantially broad.

As written, Section 4.13 of the Code is narrowly tailored to serve a significant state interest. Thus, on its face, it is constitutionally valid. *See Zook,* 748 F.2d at 1167. Therefore, Defendants' motion for summary judgment on this claim is granted. Next, the Court will consider Plaintiff's First Amendment retaliation claim.

### B. First Amendment Claim

Plaintiff next alleges that, after granting an on-camera television interview regarding the Union's political endorsements, he was disciplined in violation of his First Amendment rights. Defendants respond that the discipline did not violate Plaintiff's First Amendment rights because: (1) the speech was not protected; (2) Defendants' interests in preventing disruption of the workplace outweighed Plaintiff's First Amendment interests; and (3) Plaintiff was disciplined because of a violation of the Department's Code and, thus, Plaintiff was not disciplined based on the content of his speech. Alternatively, Defendants argue that the Court should dismiss the Complaint against Sheriff Lafferty on the grounds of qualified immunity.

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick,* 461 U.S. at 140, 103 S.Ct. 1684 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). How-

---

5. Standard 4.4, entitled "Public Statements and Appearances," states, in relevant part: *"[w]hen acting as representatives of the department,* officers shall receive approval from the sheriff before they address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or periodical release, or di-

vulge investigative information or any other matters of the department." *See Zook,* 748 F.2d at 1163 (emphasis added). Because the Court finds Standard 4.4 in the *Zook* case to be similar to Section 4.13 in the instant case, it is persuaded by the *Zook* Court's finding with respect to the facial validity of such a regulation.

ever, it is well established that a public employee's freedom of speech is not absolute because the government has a legitimate interest in "promoting the efficiency of the public services it performs through its employees." *Heil,* 147 F.3d at 109 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). "Because resolution of the conflict between these two competing interests involves a fact-specific inquiry, the Supreme Court has refused to 'lay down a general standard against which all such statements may be judged.'" *Hale v. Mann,* 219 F.3d 61 (2d Cir.2000) (quoting *Pickering,* 391 U.S. at 569, 88 S.Ct. 1731). Thus, when courts are faced with government employees' First Amendment claims, they should balance the interest of the employee in "commenting upon matters of public concern and the interest of the State, as an employee, in promoting the efficiency of the public services it performs through its employees." *Id.* (citation omitted).

■ Prior to engaging in this balancing process, however, the Court should consider whether the employee has proven by a preponderance of the evidence that: (1) his speech was on a matter of public concern; (2) the employer's actions were motivated by or substantially caused by the employee's exercise of his First Amendment rights; and (3) the employer's actions effectively chilled the exercise of the employee's First Amendment rights. *See Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998); *Heil,* 147 F.3d at 109. If the employee establishes these elements, the burden shifts to the employer to establish that it would have taken the same action "in the absence of the protected conduct." *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In this case, the Court has already determined that Plaintiff's speech was on a matter of public concern. *See Bench Decision,* at *5. Accordingly, the Court will consider whether Plaintiff has established that he was disciplined because of the exercise of his First Amendment Rights. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff was disciplined for his conduct—the violation of the Code—rather than the content of his speech. This argument is supported by the fact that prior to disciplining Plaintiff Defendants initiated an investigation into his public appearance. After the investigation determined that Plaintiff had, in fact, granted a television interview while on duty and in uniform, Defendants concluded that Plaintiff had violated, *inter alia,* Section 4.13 of the Code and issued a formal Notice of Discipline. *See* Belch Aff. Ex. J ("Certainly any one wearing an official Sheriff uniform commenting on a political election would be holding themselves out as a representative of this agency."). Thus, a Notice of Discipline against Plaintiff was filed.

Plaintiff responds that he did not violate the code and the facts support an inference that Defendants disciplined him based on the content of his speech. Plaintiff asserts that Defendants did not initiate the investigation into Plaintiff's television appearance until they received complaints from individuals the Union did not endorse regarding the content of the interview, arguing that this suggests that the content of Plaintiff's speech spurred the discipline. Plaintiff further argues that the interview did not violate Section 4.13 of the Code because Plaintiff did not "hold[ ] himself out as having an official capacity." Specifically, Plaintiff disputes Defendants' conclusion that the fact that he was on duty and in uniform at the time of the interview would lead the viewing audience to believe that he was speaking on behalf of the Sheriff's Department. Plaintiff asserts that viewing the interview as a whole, it was clear that he spoke on behalf of the Sheriff's Association not the Sheriff's Department. The interview in question lasted approximately five seconds, a banner headline reading "Sheriff's Association" covered the bottom half of the screen for about half of the interview, and introducto-

ry and conclusory comments of the news anchor identified Plaintiff as a representative of the "Sheriff's Association" or Union. The Commentator additionally attributed Plaintiff's endorsements to the Sheriff's Association.

■ The determination of whether Plaintiff did or did not violate Section 4.13 of the Code, however, is unnecessary to the decision of whether or not Defendants unlawfully disciplined Plaintiff because of the content of his speech. The factual record in this case clearly establishes that Defendants acted because they believed Plaintiff had violated the Code by granting a television interview while holding himself out as an official of the Sheriff's Department. *See* Belch Aff. Exs H, J, K, L, N. Moreover, the factual record establishes that the Sheriff took reasonable investigative measures prior to issuing the Notice of Discipline.[6] The fact that a reasonable person may disagree as to whether Plaintiff did in fact violate Section 4.13 does not, standing alone, establish an inference of retaliation. Plaintiff has asserted no evidence from which a rational jury could conclude that Defendants disciplined him because of the content of his speech rather than the apparent violation of the Code.[7] Because Plaintiff has not adduced facts from which a rational jury could conclude that Defendants disciplined him due to the content of his speech rather than his apparent violation of the Code, a rational jury could not conclude that Defendants acted with improper motivation. Accordingly, Defendants motion for summary judgment on this claim is granted.[8]

Assuming, *arguendo*, that Plaintiff had established a genuine issue of fact regarding unlawful motive, the Court will consider whether Plaintiff's "interest in expressing [himself] on this matter [is] outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Waters*, 511 U.S. at 668, 114 S.Ct. 1878. This is a matter of law for determination by the Court rather than a matter of fact for determination by the jury. *See id.; see also Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 70, 145 L.Ed.2d 60 (1999).

Numerous factors are relevant to the *Pickering/Connick* balancing test including the nature, time, place and manner of the speech. Additionally, the balancing must consider "whether the statement sought to be protected impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . . or impedes the performance of the speakers' duties or interferes with the regular operation of the enterprise." *See Lewis*, 165 F.3d at 162 (citations omitted); *see also Rankin*, 107 S.Ct at 2899 (citation omitted); *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir.1997). In *Waters*, the Supreme Court held that in reviewing an employer's decision to punish protected

6. Plaintiff places great emphasis on the fact that at the time Sheriff Lafferty ordered the investigation he did not know that Plaintiff had given a television interview. However, the Sheriff is supposed to investigate complaints. The fact that Sheriff Lafferty initiated an investigation rather than immediately imposing disciplinary charges supports Defendants claims that they acted based on the apparent Code violation rather than in retaliation for Plaintiff's political endorsements. *See, e.g., Waters v. Churchill*, 511 U.S. 661, 677, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (considering what a reasonable employer would do).

7. The fact that the initial complaints were from candidates whom the Union did not endorse does not suggest that Defendants were motivated by the content of Plaintiff's speech.

8. This analysis applies equally to Defendants *Mt. Healthy* defense. The finding that Plaintiff was disciplined because of his conduct rather than his speech establishes a legitimate, non discriminatory reason for Defendants' actions. Plaintiff has not adduced evidence from which a reasonable jury could find that these reasons were not Defendants true reasons for Plaintiff's discipline. Accordingly, summary judgment is independently warranted under *Mt. Healthy*.

speech, courts should give deference to the decision maker's conclusion and determination of facts. *Id.* at 677, 114 S.Ct. 1878. Although this deference is not complete, in evaluating the government's action, courts should look to "the facts as the employer *reasonably* found them to be" and "[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." *Id.* at 677–78, 114 S.Ct. 1878. In other words, the employee cannot challenge the "substantive accuracy of the employer's factual conclusions" in a First Amendment action. *Id.* at 679, 114 S.Ct. 1878. "Of course, an employee may be able to challenge the substantive accuracy of the employer's factual conclusion under state contract law, or under some state statute or common-law cause of action." *Id.*

Subsequent to the Supreme Courts decision in *Waters*, the Second Circuit enunciated the following three part test in evaluating the circumstances under which a government employer may take adverse employment action against an employee for speaking on a matter of public concern: "(1) if the employer's prediction of disruption is reasonable;[9] (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *See Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995); *see also Spetalieri v. Kavanaugh,* 36 F.Supp.2d 92, 106 (N.D.N.Y.1998).

The evidence before the Court demonstrates that the Sheriff Department's pre-diction of disruption was reasonable. As discussed above, Defendants reasonably believed that Plaintiff's speech violated Section 4.13 of the Code and, thus, could be penalized. Moreover, the interests underlying Section 4.13, including regulating official comments on behalf of the government and avoiding the appearance of partisanship, suggest that, in the absence of a specific Code violation, Plaintiff's speech endangered the effective operation of the workplace. *See* discussion *infra* at 147–48.

Having determined that the government's fear of disruption was reasonable, the Court will consider whether the potential disruptiveness outweighed the value of Plaintiff's speech. The nature of Plaintiff's speech plays a significant role in the balancing. Here, because Plaintiff's speech substantially involved a matter of public concern,[10] "a stronger showing may be necessary" for the employer to establish that the government's interests outweigh the employee's First Amendment interests. *See Connick,* 461 U.S. at 151, 103 S.Ct. 1684; *Lewis,* 165 F.3d at 162; *Bieluch,* 999 F.2d 666 ("[I]f the employee's speech substantially involved matters of public concern, the government must make a stronger showing of interference with operations than occurred in *Connick.*") (citation omitted). In spite of the high value of Plaintiff's speech, the facts that Plaintiff reasonably appeared to be speaking on behalf of the Sheriff's Department, his statements potentially endangered the Sheriff Department's aura of neutrality,[11]

**9.** Plaintiff argues that this defense requires a showing of actual harm. The Supreme Court squarely rejected this contention in *Waters,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686.

**10.** Plaintiff's political speech is entitled to a high degree of First Amendment protection. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 48, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (political speech rests at the "core" of First Amendment); *Bieluch v. Sullivan,* 999 F.2d 666, 671 (2d Cir.1993), *cert. denied,* 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994) (Plaintiff's speech "contributed to debate on public issues, the very kind of speech the First Amendment was designed to protect.").

**11.** Defendants also argue that because Plaintiff was on duty when the interview was given they reasonably believed his absence from the road would cause substantial disruption to the Department. Plaintiff established that he did not miss any calls due to the interview and no one tried to contact him during this time. Moreover, Plaintiff established that deputy sheriff's, like Plaintiff, could spend work time on personal activities such as get-

*see infra* Section II(A), he made the statements while on duty,[12] and Plaintiff was free to make comments so long as he did not appear to be speaking on behalf of the Department, tip the balance in favor of the government. *See, e.g., Moore v. City of Wynnewood,* 57 F.3d 924 (10th Cir.1995). Accordingly, in the circumstances of this case, the Court finds that the potential disruptiveness of Plaintiff's speech outweighed its First Amendment value.[13]

Finally, the Court has already determined that Defendants disciplined Plaintiff due to the potential disruptiveness of his speech (based on a violation of Section 4.13) rather than the content of his speech. Accordingly, the Court finds that Defendants initiation of disciplinary proceedings was based on reasonable prediction of disruption and, thus, did not violate Plaintiff's First Amendment rights. *See, e.g., Jeffries,* 52 F.3d at 13.

### C. Retaliation Claim

■ Plaintiff next alleges that Defendants took certain other actions against him in retaliation for his speech. Specifically, Plaintiff alleges that: (1) Sheriff Lafferty increased the discipline stemming from the Code violation in retaliation for his opposition to the charges; (2) Lena Ward harassed him in retaliation for his political speech; and (3) Defendants failed to promote him on two occasions in retaliation for his opposition to the disciplinary actions and commencement of this lawsuit. To establish a claim that a public employer took adverse employment action in retaliation for its employee's exercise of his First Amendment rights, Plaintiff must prove: "(1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). If Plaintiff establishes these elements Defendants again have the opportunity to avoid liability if they can show they would have taken the same action in the absence of the protected conduct. *See id.*

The Court has already determined that Plaintiff's television interview involved protected speech. Likewise, Plaintiff's opposition to the disciplinary charge and commencement of this lawsuit constitute protected activity. *See, e.g., Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 443 (2d Cir.1999).

■ Thus, the Court will consider whether the actions Plaintiff complains of constitute adverse employment actions. An adverse employment action must relate to a significant aspect of the employment relationship, *see Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), and create "a materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). Discharge, demotion, refusal to hire, refusal to promote, and reprimand are adverse employment actions. *See Ka-*

---

ting food, calling home, and using the bathroom. *See* Lafferty Tr. at 114–15; Miller Tr. at 116–18. Moreover, Plaintiff was permitted to spend work time on Union business so long as the Union business did not take significant portions of time. *See* Williams Tr. at 25. Because Defendants have not produced evidence from which the Court could conclude as a matter of law that Plaintiff's absence from his post impeded his duties or interfered with the operation of the Sheriff's Department, the Court's conclusion does not rely on this argument.

12. The time, place, and manner of an employee's speech are relevant factors in determining whether the government's interest in regulating the speech outweighs the employee's interest in expression. *See Connick,* 461 U.S. at 162, 103 S.Ct. 1684; *Lewis* 165 F.3d at 162.

13. This holding is limited to the facts of this case where Plaintiff gave an interview on political matters while on duty and in uniform without the prior approval of the Sheriff.

*luczky v. City of White Plains,* 57 F.3d 202, 208 (2d Cir.1995). Thus, Plaintiff's discipline constitutes an adverse employment action. The alleged harassment of Lena Ward, on the other hand, did not effect a term or condition of Plaintiff's employment and, thus, is not an adverse employment action. *See, e.g., Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) ("not every unpleasant matter" creates a cause of action for retaliation).

■ There are questions of fact surrounding Plaintiff's allegations that Defendants did not promote him for retaliatory reasons. Defendants allege that the positions Plaintiff sought were lateral transfers involving no change in pay, status, title, etc. and, thus, their denial does not rise to the level of an adverse employment action. *See* Lafferty Aff. ¶ 32, Ex. I. Plaintiff, on the other hand, asserts that the positions were promotions. Regardless of whether the positions of Juvenile Aid Officer or Detective–Drug Task Force are considered promotions or transfers, it is clear from the factual record that the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement. Thus, Defendants' denial of Plaintiff's applications constitutes adverse employment action. *See, e.g., Galabya v. New York City Board of Ed.,* 202 F.3d 636, 641 (2d Cir.2000) ("[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.") (citations omitted); *Morris,* 196 F.3d at 113 ("To constitute an adverse employment action, a transfer must be accompanied by a negative change in the terms and conditions of employment."); *Carlucci v. Kalsched,* 78 F.Supp.2d 246, 254 (S.D.N.Y.2000) ("Adverse employment action is defined by the Supreme Court in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, [75] (1990), to include not only actual discharge or disciplining by an employer, but also any action that affects 'promotions, transfers and recalls after layoffs.' "); *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 378 (S.D.N.Y.1999) ("Accordingly, the denial of a request for transfer to departments where conditions were more favorable constitutes an adverse action.").

Thus, the Court will consider whether Plaintiff has established that Defendants increased the penalty proposed by the arbitrator and denied his applications for the positions of Juvenile Aid Officer and Detective Drug Task Force for impermissible reasons. In order to satisfy this element, a plaintiff must allege a causal connection that is sufficient to warrant the inference that the protected conduct was a substantial or motivating factor in the adverse employment action. *See Ezekwo v. NYC Health and Hospitals Corp.,* 940 F.2d 775, 780–81 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed closely by adverse treatment in employment, or directly by evidence of retaliatory animus. *See Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Conclusory allegations of retaliation, however, will not establish a genuine issue of material fact with respect to improper motive. *See Morris,* 196 F.3d at 111.

Plaintiff first argues that the Court can infer an improper, retaliatory motive from the temporal connection between his protected speech and the alleged adverse employment actions. Sheriff Lafferty rejected the proposed penalty by the arbitrator and imposed a greater penalty at the conclusion of the arbitration proceedings. Plaintiff's application for Juvenile Aid Officer was denied in April 1998, approximately one month after the conclusion of the arbitration on March 6, 1998. Defendants denied Plaintiff's application for the Detective–Drug Task Force position in October 1998, approximately three months after Plaintiff commenced this action. Plaintiff

further alleges that the fact that Defendants challenged certain grievances he brought in state court, rather than allowing them to go to arbitration, indicates retaliatory animus.[14] Next, Plaintiff offers evidence that Defendants put a newspaper article entitled "Deputy Punished For Being on TV Wants Case Reconsidered" in his personnel file.[15] Additionally, Plaintiff points to Undersheriff Simser's notes regarding his interview with Plaintiff for the Detective–Drug Task Force position as evidence of retaliatory animus. These notes do not include any discussion of the position, the answers to any questions asked during the interview, or list any of Plaintiff's qualifications. The notes do contain a hand written notation stating "suing the Sheriff not the best move." *See* Belch Aff. Ex. X. It is unclear from the text of the notes whether this comment memorializes something Plaintiff said or the thoughts of the Undersheriff, the note taker. A second notation indicates that Plaintiff made this comment, *see id.*, however, Plaintiff alleges the second notation was made after the interview. Looking at the evidence before the Court in the light most favorable to the Plaintiff, a rational jury could conclude that Defendants increased Plaintiff's discipline and denied his two transfer requests for impermissible retaliatory reasons.

■ Because Plaintiff has established a genuine issue of material fact with respect to causation, the Court will consider Defendants' *Mt. Healthy* defense. Defendants assert that Sheriff Lafferty increased Plaintiff's discipline because of his belligerent attitude, lack of remorse, and to instill respect for the chain of command. Defendants further assert that Plaintiff was not the best candidate for the job of Juvenile Aid Officer (although he was the most senior candidate) and the applicant chosen had superior communication skills. *See* Lafferty Aff. ¶ 33. Defendants further assert that Plaintiff was not selected for the Detective Drug Task Force position because, among other things, he was not the most senior applicant. Plaintiff responds that the above reasons do not establish that but for his protected conduct Defendants would have made the same employment decisions. Specifically, Plaintiff notes that seniority was the deciding factor in only one of the two employment decisions he complains of.[16] Taking all the evidence and inferences in the light most favorable to the Plaintiff, a rational jury could conclude that Defendants proffered reasons were not the true reasons for their actions and that the totality of circumstances suggests that Defendants actions were retaliatory. Accordingly, Defendants motion for summary judgment on this claim is denied. While the evidence outlined above is sufficient to establish a genuine issue of fact precluding summary judgment on Plaintiff's retaliation claim it is insufficient to establish liability as a matter of law. Accordingly, Plaintiff's motion for summary judgment on the issue of liability is denied.

14. Plaintiff's Union filed a grievance regarding the increase in penalty stemming from the March 6, 1998 arbitration. Defendants attempted to stay this arbitration by filing an Order to Show Cause in state court. Defendants appealed the denial of the motion. Plaintiff also brought a grievance regarding a partial denial of Plaintiff's application for benefits pursuant to N.Y. GEN. MUNICIPAL LAW § 207–c. Defendants again sought to bar arbitration on this grievance by seeking an order in state court. *See* Belch Aff. ¶¶ 33–35, Exs. S, T. Defendants assert that the proper place to challenge a denial of 207–c benefits is state court, not arbitration, and contend that Plaintiff was not seriously injured such that these benefits were available. *See* Lafferty Aff. ¶¶ 27, 28.

15. Defendants contend that it is routine practice to put newspaper articles about employees in their personnel files. *See* Lafferty Aff. ¶ 29.

16. Sheriff Lafferty explained that "It is not unusual for seniority to be the determining factor in some positions, but not others. When an officer has specific experience in a certain area, such as Michael Dickinson's superior 'people skills,' such experience is often the deciding factor, rather than seniority." Lafferty Aff. ¶ 33.

**156**

### D. Political Association Claim

Finally, the Court will address Plaintiffs' freedom of association claim. Plaintiff has not alleged any facts suggesting that Defendants have encumbered his political associations and, thus, Defendants' motion for summary judgment on this claim is granted. *See, e.g., Fighting Finest v. Bratton,* 95 F.3d 224, 228 (2d Cir.1996).

### III. Conclusion

Defendants' motion for summary judgment on Plaintiff's claims that Defendants violated his First Amendment rights by disciplining him for an unauthorized television appearance, that Section 4.13 of the Code of Conduct is overbroad, and that Defendants infringed on Plaintiffs' First Amendment Right to Political association are GRANTED. These claims are dismissed in their entirety. Defendants motion on Plaintiff's claims that the increase in discipline and denial of two transfers were retaliatory are DENIED. Plaintiff's motion for summary judgment on the issue of liability on these claims is also DENIED. In all other respects, the motions for summary judgment are DENIED.

**IT IS SO ORDERED.**